# IN THE UNITED STATES DISTRICT COURT FOR THE
# WESTERN DISTRICT OF MISSOURI
# CENTRAL DIVISION

| | |
|---|---|
| JUANITA WERNER, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) Case No. 04-4312-CV-C-NKL-SSA |
| | ) |
| JO ANNE B. BARNHART, | ) |
| Commissioner of Social Security, | ) |
| | ) |
| Defendant. | ) |

## ORDER

Pending before the Court is Plaintiff Juanita Werner's ("Werner") Motion for Summary Judgment [Doc. # 12]. Werner seeks judicial review of the Commissioner's denial of her request for supplemental security income benefits, under Title II of the Social Security Act, 42 U.S.C. §§ 401 *et seq.* The Administrative Law Judge ("ALJ") found that Werner was not entitled to benefits, and such determination became the final decision of the Commissioner when the Appeals Council denied Werner's request for review. Werner has exhausted her administrative remedies, and jurisdiction is conferred on this Court pursuant to 42 U.S.C. § 405(g). Because the ALJ's decision was not supported by substantial evidence in the record as a whole, his decision will be reversed and benefits will be granted.

1

## I. Procedural History

On November 15, 2002, Werner filed her application for Social Security Disability Benefits. (Tr. 92.) She received a hearing before the Honorable Julian D. Cosentino, Administrative Law Judge on May 20, 2004, in Jefferson City, Missouri. (Tr. 21) On July 26, 2004, Judge Cosentino denied Werner's benefits because he found she was not disabled as defined by law and was not entitled to Disability Insurance Benefits. On August 9, 2004, Plaintiff filed a Request for Review of Hearing (Tr. 8) and on November 1, 2004, Judge Cosentino's decision was affirmed by the Appeals Council. (Tr. 3.) The decision of the Administrative Law Judge, as affirmed by the Appeals Council, is a final decision of the Commissioner of Social Security.

## II. Background

Werner was involved in an automobile accident on May 8, 2001. At that time, she reported a history of asthma and non-insulin dependent diabetes mellitus. The accident caused a right patellar fracture, right knee laceration, right patella insertion avulsion fracture, bilateral clavical tenderness, and cervical spine tenderness. She was given a knee immobilizer and discharged on May 10, 2001. After several visits to the Orthopaedic Surgery Clinic to see Dr. Walter Greene, a return to work permit was issued on August 20, 2001, indicating that Werner was to return to full duty, no restrictions.

Werner was seen by the University of Missouri Hospital and Clinics emergency room on October 23, 2001, due to right knee pain. X-rays showed no fracture or dislocation though a calcaneal heal spur was present. Results of an MRI on her right knee

on December 24, 2001, were "negative." Physical therapist, Todd Critchfield, reported that Werner's chief complaint was right knee pain resulting from a motor vehicle accident which occurred on May 8, 2001. She underwent twenty-one physical therapy treatments for her chondromalacia of the right patella as of January 22, 2002.

Werner was seen by Dr. William Allen on January 3, 2002, in the Orthopaedic Surgery Clinic. He noted she had been treated for the fracture of her patella and traumatic incident with her right knee and that these had healed well but that she continued to have a considerable amount of pain in her knee. Dr. Allen felt that the Plaintiff had a neuroma in the area. On January 24, 2002, Dr. Allen excised the neuroma and did a diagnostic arthroscopy of the right knee. Dr. Allen saw Werner again on February 11, 2002, to remove her sutures. She went through physical therapy from February 12, 2002 to March 7, 2002, at the Callaway Community Hospital. After another visit with Werner on February 28, 2002, Dr. Allen wrote that because her knee had previously been so painful, she had marked atrophy of the muscles in that leg and it was difficult for her to get back to her laboring type of job. He sent her to vocational rehabilitation but because of the type of work that she did, he thought she may not be available to work for another three months.

Werner saw Dr. Greene on May 1, 2002, for a follow-up of her right knee injury. She was walking without pain but had trouble going up and down steps. The strength in her legs was better. She was discharged from Dr. Allen's care on June 6, 2002.

3

Werner saw Dr. Bradley on June 5, 2002, and indicated that she was having emotional problems. He referred her to the University of Missouri Hospital and Clinics Behavioral Health Services on June 11, 2002, where she was diagnosed as having major depressive disorder. She was seen at the University of Missouri Hospital and Clinics on July 23, 2002, for psychotherapy. She was feeling angry and frustrated about her knees. She reported that she had been in fights all her life and could not handle going back to jail for fights.

Werner saw Dr. Cla Stearns, a licensed psychologist, on July 19, 2002, at the request of the Missouri Division of Vocational Rehabilitation. Plaintiff's medical history was noted to be significant for injury to her right leg secondary to a motor vehicle accident in May of 2001. She indicated that she could not walk or stand for prolonged periods. She reported that she had received special education services until 11th grade, when she quit school. Werner had a Full Scale IQ of 71, a Verbal IQ of 66, and a Performance IQ of 81 based upon taking the WAIA-III IQ Test. She also took a Woodcock Johnson Test of Achievement, Third Edition. Overall reading skills were typical to that of a fifth grade student near the end of the school year, overall math skills were similar to that of a typical sixth grade student at the middle of the school year, and overall writing skills were similar to that of a typical second grade student near the end of the school year. A Brief Personality Assessment indicated that Werner used denial and repression to maintain emotional control, and experienced aggression. She reported some depression and anxiety related symptoms, including crying easily for no real reason,

4

being irritable, restless, being excessively worried, sleep disturbances, and some difficulty with concentration. She reported that these symptoms were present more seriously since her accident. She denied any significant impairment to interpersonal functioning or her daily routine because of the emotional distress. Psychologist Sterns's opinion was that Werner's academic skills were much more similar to those expected of elementary school students than students who were entering college as a freshman.

Werner was seen by Dr. John Baird at the Missouri Heart Center on August 13, 2002, due to chest pain. He noted that she had trouble walking, as well, because of her arthritis and previous injuries from a motor vehicle accident. She had an essentially normal EKG record. She took a stress test on August 20, 2002. She had limited exercise tolerance, significant increase in heart rate with low levels of activity, no significant EKG changes with stress, no angina with stress. She had an echocardiogram on August 20, 2002, that showed normal left ventricular size and systolic function estimated ejection fraction of 60%, all other chambers were normal in size and function, mildly thickened mitral valves without stenosis.

Werner was seen at the University of Missouri Hospital and Clinics on August 20, 2002, for psychotherapy, where she was diagnosed with major depressive disorder recurrent, anger problems, r/o [rule out] intermittent explosive disorder, r/o PTSD. She filed a Supportive Employment Assessment Background and History obtained on October 2, 2002, from Vocational Rehabilitation. It was indicated that she had been diagnosed with borderline intelligence and received special education classes and speech therapy

during childhood. She had multiple concussions and she was unable to stand for long periods of time, climb ladders, and had problems kneeling. Werner's job history was extensive. She had many jobs that usually lasted for the most part of a year. Plaintiff had some assessments at different job sites. It was indicated that she had a problem standing in one area for a long period of time. It was indicated that Werner needed to find a job that would fit her needs so that it would not be hard on her knees.

A Monthly Progress Report for the Division of Vocational Rehabilitation was done on October 10, 2002, by DDR Counselor Carol Smith. According to Ms. Smith, Werner's interests did not complement her work experience. It was indicated that it may be difficult finding her a job without previous experience.

A Report of Contact was obtained by Terri Dewey of Disability Determination Services on December 13, 2002. Plaintiff had stopped going to the doctor because she did not feel that he was helping her and she had accepted that she was "crippled." She indicated that the knee surgery had helped her knee pain, but she still had trouble walking because her knee locked up on her. She had trouble walking on flat ground, but going up hills and stairs was even harder. On November 25, 2002, her knee gave out and she fell down. Since that time she had been using a walker. She said she could not use a cane because she was too clumsy.

Werner saw Dr. Steve Taylor on January 30, 2003, at the request of Disability Determinations for an examination. Dr. Taylor wrote that in the fall of 2002, her diabetic peripheral neuropathy began to worsen. Both feet went completely numb and the right

6

leg was more difficult to control. In November of 2002, she went to a concert with her husband and fell to the ground. She indicated that her right knee just buckled. Since then she had been using a walker. Currently, her glucose was greater than 200 on most accuchecks. Dr. Taylor indicated that Werner had chronic knee pain, unable to walk but short distances. A neurologic examination indicated that the reflex of the right knee produced significant tenderness. Dr. Taylor's impressions were chronic right knee pain and weakness, diabetes with prominent peripheral neuropathy, asthma, family history of diabetes, ovarian and caustic cancer, GERD, hyperlipidemia, and sleep apnea. Dr. Taylor wrote that Werner had had two knee surgeries since the car accident in May of 2001. She made an attempt to work following the first knee surgery and did so until November of 2001, when the second surgery was required. Dr. Taylor wrote that since the second surgery, her right knee had been fairly comfortable as long as she took her time with it. Dr. Taylor wrote, "The onset of diabetic neuropathy, I believe, precludes her ever returning to work. I think that she meets full disability . . . ."

A Report of Contact was made between Terri Dewey from Disability Determinations and Cheryl Meister, the claimant's sister, on February 24, 2003. Ms. Meister indicated that she saw the Werner several times a month and since she had hurt her knee, she had great difficulty getting around. The last surgery had taken some of the pain away, but she still had trouble with mobility. She used a walker anytime she left the house. She would usually use a walker inside of the house also. Werner had to sit on higher chairs, and anytime she would sit more than just a few minutes, her knee would

7

become stiff and she would have trouble getting up and moving around. She could not ride in certain vehicles because she was not able to get in and out. Occasionally, she would go to Wal-Mart and use an electric cart, unless she just had to get one item.

A Report of Contact was obtained between Mr. Dewey and Werner on February 26, 2003. He asked her about her depression. She indicated that she was not as depressed as she was over the summer, but she was still angry that she did not have full use of her leg and she was unable to work. Mr. Dewey wrote, "I also asked the Claimant if she felt that she could do a sit down job. She said she won't have any problems physically but he doesn't think that she could get a sit down job because she doesn't type very well."

Werner saw Dr. Allen again on April 8, 2003. Dr. Allen wrote, "She uses a walker and for the life of me I do not know now [sic] why." She got up during an examination and showed him that she limped and walked around the room without the walker. Dr. Allen felt that she had good range of motion, no swelling, and he thought she would benefit from having an exercise program and building up the strength in her leg. She had good pulses, good hair growth, and no evidence of circulatory problems with her leg. An x-ray obtained that day showed that there was a 5 millimeter calcification in the patellar tendon near its insertion on the tibial tubercle. No fracture. Normal narrowing of the medial compartment. Exams of her right and left ankle were normal on October 10, 2003.

On November 21, 2003, an x-ray of Werner's left foot showed that there was a transverse fracture at the proximal base of the fifth metatarsal of the left foot. She saw

Dr. Sonny Bal on December 8, 2003, at the University of Missouri Hospital and Clinics. Dr. Bal wrote that Plaintiff had a fifth metatarsal base fracture. She was weightbearing, but he asked her be non-weightbearing because there was a risk and possibility of Charcot joint. The date of injury was November 17, 2003. Werner saw Dr. Bal on January 14, 2004. There was no diabetic foot breakdown. She had been full weightbearing already all of the time. She had an EMG performed at the University of Missouri Hospital and Clinics on February 9, 2004. She had a normal nerve conduction study of the left peroneal and tibial nerves and a normal sensory nerve conduction study of the left sural and ulnar nerves. She had complaints of a cold and numbness in her feet for two years. She saw Dr. Bal on February 23, 2004. She had no breakdown of her fracture in her foot. There was no swelling. Plaintiff had not worn the shoe that he had given her and was wearing regular street shoes with full weightbearing, in other words, no compliance.

**B. Testimony**

Werner, represented by counsel, appeared for a hearing on May 20, 2004, in Jefferson City, Missouri, before Administrative Law Judge Julian Cosentino. She was 43 years of age at the time of the hearing and had completed 12 years of school which included special classes for math and English. Werner's last job was as a custodian at the Fulton State Hospital. Previously, she had also done work bussing tables and dishwashing. She stopped working at the hospital in November of 2001 due to injuries suffered to her knee in the car accident of May 8, 2001. Werner was seeing Dr. Bradley in Centralia, Missouri, who treated her for diabetes and high cholesterol. She was on

9

medication for her diabetes and checked her blood sugar levels twice a day. They were running between 120 and 150. Werner testified that her husband did the vacuuming and sweeping around the house. She testified that when she goes to Wal-Mart, she uses a wheelchair. She testified that she could walk about a block, and has had problems falling down five or six times in the last month due to her knee. She testified that she wore special shoes because she was a diabetic, and described her feet as getting hot and cold. Plaintiff testified that she would elevate her feet and legs four to five times a day to relieve her leg pain. Plaintiff had worked as a personal attendant for an elderly woman. She had to lift up to 25 pounds doing this job. Werner testified that she had difficulty with reading. In school, she had difficulties with math and flunked one grade.

Werner's sister, Cheryl Meister, was also called to testify. She indicated that she saw Werner once or twice a week. Meister testified that since her car accident, Werner had been less mobile and used a walker at home. When they would go to Wal-Mart, she would usually go to the front and sit and wait. The witness testified that Werner's swelling in her leg was noticeable from the knee down, and in the feet. The witness testified that she first noticed the swelling the first part of the summer of the last year because, at a family outing, Plaintiff sat at a picnic table with her feet up. It was usually the right leg that would be swollen. Meister testified that Werner was in special education from the beginning of school and that she would help Werner with her paperwork at times because she did not understand.

10

Vocational Expert, John McGowan, testified that Werner's past work as housekeeper, Fulton Home Healthcare Aide, dishwasher and food service were mostly medium jobs. In these jobs, an individual would have to be on their feet the better part of the day. He testified that Plaintiff would not be able to do any of the work if she had to elevate her legs.

The Administrative Law Judge asked if an individual with a Verbal IQ of 66, a Performance IQ of 81, and a Full Scale IQ of 71 could function in any sedentary jobs. McGowan testified that Werner could perform jobs such as assembler, hand worker, and jobs in packaging/filling operations. In the Central Missouri area, he reported 2,365 jobs, 690 jobs, and 700 jobs respectively in these three fields. Statewide, he reported 34,000 jobs, 1,100 jobs, and 10,000 jobs respectively.

## III.   The ALJ's Decision

The Administrative Law Judge found that Werner has diabetes mellitus, a history of right patellar and fifth metatarsal fractures, borderline intellectual functioning, and depression with anger, but that she does not have an impairment or combination of impairments listed in, or medically equal to, one listed in Appendix 1, Subpart P Regulations No. 4. He also found that Werner has residual functional capacity to perform the physical exertion and nonexertional requirements of work except for lifting and carrying more than twenty pounds occasionally and ten pounds frequently. She can stand thirty to forty-five minutes intermittently for up to fours hours per day. Although Werner cannot perform a full range of light work, there is a significant number of jobs she could

perform, including assembler, hand worker, and jobs in packaging/filling operations. (Tr. 19.)

## IV. Standard of Review

The District Court's review of the Commissioner's decision is limited to a determination of whether the decision is supported by substantial evidence on the record as a whole. *See Johnson v. Chater*, 108 F.3d 178, 179 (8th Cir. 1997). Substantial evidence is relevant evidence that a reasonable mind would accept as adequate to support the Commissioner's conclusion. *See Craig v. Apfel*, 212 F.3d 433, 435 (8th Cir.2000). If, after reviewing the record, it is possible to draw two inconsistent positions from the evidence and one of those positions represents the Commissioner's findings, the Commissioner's decision must be affirmed. *See Young v. Apfel,* 221 F.3d 1065, 1068 (8th Cir. 2000) (citing *Roth v. Shalala*, 45 F.3d 279, 282 (8th Cir. 1995)). As long as substantial evidence in the record supports the Commissioner's decision, the Court may not reverse it either because substantial evidence exists in the record that would have supported a contrary outcome or because the Court would have decided the case differently. *See Holley v. Massanari*, 253 F.3d 1088, 1091 (8th Cir. 2001).

## V. Discussion

The Commissioner's regulations governing determinations of disability set forth a five-step sequential evaluation process which the Commissioner must use in assessing disability claims. *See* 20 C.F.R. § 404.1520 (2004). A claimant has the burden of proving disability by establishing a physical or mental impairment which will persist for

12

at least twelve consecutive months and prevents the claimant from engaging in substantial gainful activity. *See Fisher v. Shalala*, 41 F.3d 1261, 1262 (8th Cir. 1994); *Wiseman v. Sullivan*, 905 F.2d 1153, 1155 (8th Cir. 1990). If a claimant establishes that she is not able to return to her past relevant work, the burden of proof shifts to the Commissioner to show that the claimant can perform work existing in significant numbers in the national economy. *See* 20 C.F.R. § 404.1520 (2004). The Commissioner may meet this burden by relying on the medical-vocational guidelines or vocational expert testimony.

Werner argues that the ALJ's finding that she is not disabled is not supported by substantial evidence because he did not consider whether she is mentally retarded. The listing for mental retardation provides as follows:

> 12.05 Mental retardation: Mental retardation refers to significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested during the developmental period; i.e., the evidence demonstrates or supports onset of the impairment before age 22.
>
> The required level of severity for this disorder is met when the requirements in A, B, C, or D are satisfied.
>
> . . . .
>
> C. A valid verbal, performance, or full scale IQ of 60 through 70 and a physical or other mental impairment imposing an additional and significant work-related limitation of function.

20 C.F.R., Part 404, Subpart P, Appendix 1, § 12.05 (2004). Werner argues that her I.Q. score, combined with her other impairments, satisfies both prongs of part C.

The Administrative Law Judge did not expressly consider whether Werner met the listing for Mental Retardation in § 12.05(C). The failure to do so is not necessarily

13

reversible error as long as the record supports his overall conclusion. *See Pepper ex rel. v. Barnhart*, 342 F.3d 853, 855 (8th Cir. 2003). The ALJ did consider Werner's IQ scores but concluded that her "intellectual functioning is not a factor keeping her from working," and that she "does not have a severe impairment, which impairs her mental ability to function." (Tr. 18.) While that finding may be true, it does not accurately reflect the criteria of § 12.05(C). The listing has a two prong test: 1) one IQ score between 60 and 70, and 2) "a physical or other mental impairment imposing an additional and significant work-related limitation of function." That the ALJ found Werner did not have "a severe impairment which impairs her mental ability to function" does not mean that she doesn't have "a physical or other mental impairment imposing an additional and significant work-related limitation of function." They are different standards, and a review of the entire record indicates that Werner has such an impairment.

The first prong of § 12.05(C) is satisfied if the claimant has a valid verbal, performance, or full scale IQ of 60 through 70. The ALJ found that Werner's Verbal IQ was 66, but he noted that the score "may not be accurate, as Dr. Stearns suggested that the claimant's academic achievement for reasoning, writing, and mathematics was above that which would be expected of an individual with her measured intelligence." (Tr. 17.) The Eighth Circuit has recently held that "the Commissioner need not rely exclusively on IQ scores, and that the Commissioner may disregard test scores that are inconsistent with an applicant's demonstrated activities and abilities as reflected in the record as a whole." *Clay v. Barnhart*, 417 F.3d 922, 929 (8th Cir. 2005). However, Dr. Stearns also found

14

that Werner had a Fifth Grade reading level, a Second Grade writing level, borderline intellectual functioning, and had "worked hard to bring her skills up to their current level." (Tr. 212.) There is no basis in the record to discount Werner's Verbal IQ score of 66.

If Werner does not meet the Listing in § 12.05(C), then, it must be because she does not meet the second prong of having "a physical or other mental impairment imposing an additional and significant work-related limitation of function." This case turns, therefore, on the definition of "additional and significant" work-related limitation of function. In *Sird v. Chater*, the Eighth Circuit held that "the second prong of § 12.05(C) is met when the claimant has a physical or additional mental impairment that has a 'more than slight or minimal' effect on his ability to perform work." 105 F.3d 401, 403 (8th Cir. 1997) (quotation omitted). In that case, the ALJ denied benefits because the Plaintiff could still perform some light or sedentary jobs. *Id.* Reversing and remanding with instructions to grant benefits, the Eighth Circuit found that "the claimant['s] physical impairments prevent [him] from carrying on past relevant work. Sird's past relevant work required a full range of functions, while his current physical limitations relegate him to light or sedentary work. It requires little scrutiny to say this scenario constitutes a work-related limiting function that is more than slight or minimal." *Id.* at 404.

In this case, The Vocational Expert testified that Werner's past relevant work was mostly medium work. Due to her past knee injury and her resulting difficulty in standing and walking, the ALJ determined that Werner was limited to a reduced range of light

15

work**.**  As in *Sird* the transition from mostly medium past relevant work to a reduced range of light work is a "work-related limiting function that is more than slight or minimal."  This is not to say that the mere inability to return to past relevant work necessarily imposes a significant work-related limitation of function.  *See Buckner v. Apfel*, 213 F.3d 1006, 1011 n.2 (8th Cir. 2000) ("[W]e did not hold in *Sird* that the second part of section 12.05(C) focuses only on whether a claimant can return to past relevant work").  But the difference between the physical demands of Werner's past relevant experience (as a housekeeper and home health aide) and the physical limitations of her present condition[1] (the inability to stand longer than forty five minutes intermittently or more than four hours daily) bespeaks more than a slight or minimal work-related limiting function.  For these reasons, the ALJ's finding that Werner is not disabled is not supported by substantial evidence.

      Accordingly, it is

---

[1]Section 12.05 requires "significantly subaverage general intellectual functioning with deficits in adaptive functioning initially manifested . . . before age 22."  However, it is unclear whether both prongs of subsection C must have developed by that age.  The Court concludes that "deficits in adaptive functioning" means that only the plaintiff's inability to adapt to the additional impairment must have developed before age 22, not the additional impairment itself.  This conclusion is supported by the case law.  In *Sird,* the Eighth Circuit found that the impairments limiting the plaintiff to light work must have been his recent physical ailments because they were all that had changed since his past relevant work.  105 F.3d at 402-03.  Additionally, the court presumed that plaintiff's IQ had been the same his whole life.  Since the court remanded with instructions to give benefits based on the lifelong IQ and the recent physical impairment, the Eighth Circuit necessarily held that only the IQ prong of § 12.05(C) needs to have manifested before the age of 22.

Case 2:04-cv-04312-NKL   Document 14   Filed 09/07/05   Page 16 of 17

ORDERED that Werner's Motion for Summary Judgment [Doc. # 12] is GRANTED. The decision of the ALJ is REVERSED, and the Commissioner is ordered to pay benefits.

                                                s/ Nanette K. Laughrey
                                                NANETTE K. LAUGHREY
                                                United States District Court

Dated: September 7, 2005
Jefferson City, Missouri